Good afternoon. May it please the court, Morgan Brungard on behalf of Petitioner States. I'd like to start by clarifying what this case is not about. This is not a challenge to any part of the 2020 or 2021 performance rules. Challenges to those rules are before the Second Circuit and have been stated pending resolution of this case. This case is also not about whether the Department of Energy can ever repeal the performance rules. It can as long as it complies with the APA, and here it simply hasn't. The government should turn square corners in dealing with the people and must defend its actions based on the reasons it gave when it acted. The reasons the department gave for repealing the performance rules are arbitrary, capricious, and not in accordance with law, because they, one, misinterpret the department's own statutory authority, two, fail to explain or even acknowledge the reliance interests inquiry, and four, fail to justify not curing the perceived problem by simply setting standards for short cycle appliances. The repeal for these reasons is unlawful and should be set aside. To my first point, the repeal rule violates the plain meaning of subsection Q. Subsection Q is a, quote, special rule that gives the department authority to do three separate things in this order. First, the department can create product classes based on the type of energy or unique performance related feature. Second, the department can decide to design a new energy standard for the class if the performance feature is useful to consumers or other appropriate reasons. Third, the department sets the standard for the new class by issuing a rule specifying a level of energy use or efficiency higher or lower than the standard that would otherwise apply and then explaining the basis for that level. A different provision, subsection O, establishes how the department goes about designing the standard for the new product class. The standard must, quote, achieve the maximum improvement in energy efficiency that is technologically feasible and economically justified. And what is economically justified is determined through a cost benefit, excuse me, cost benefit analysis that looks at seven discrete things. Nothing in subsections Q or O requires the department to set a standard at the same time that it creates a new class. Congress set deadlines elsewhere in the statute, for example, subsection G, and it didn't do so here. Congress knows how to do that. It didn't, and so it didn't intend to constrain the time period between the subsection Q inquiry and the subsection O inquiry. In fact, for at least 15 years prior to the repeal rule, the department created new classes under subsection Q and deferred the subsection O analysis for a later date. The repeal rule and the briefing discuss at length prior rulemakings in 2007 and 2009, namely the distribution transformers in 2007 and the beverage vending machines in 2009. The department attempts to distinguish those rulemakings because those products were not previously subject to standards and so they could defer the establishing of those standards. I'd like to focus in on the distribution transformer rulemaking in 2007 and unpack the distinction that the department tries to make. So first, in 2007, the department invoked subsection Q to create classes with different standards. It then created a class of underground transformers and deferred the rulemaking and concluded that surface transformers would be in a different class and the department did set standards at that time for that class. So in 2007, what we have was a new underground class with no standards and surface transformers in a different class with standards. Then the department in 2013 went back and reconsidered its 2007 rulemaking and this is at 78 Federal Register 2335 and it's part of the same series, this transformer rulemaking series that is discussed at length in both the performance rules and the repeal rule. So in 2013, the department again invoked subsection Q to group the surface mining transformers that had a standard and the underground transformers that had no standard into the same class and then reserved setting a standard for that class. Now the pin sites for those things are at 78 Federal Register 23335, 23343 and at 23353 and 54. So what this means in 2013 is that the department moved a product from a class with a standard to a class without a standard without triggering the anti-backsliding provision and then deferred setting the standard which is exactly what the performance rules did. And to this day, ten years after the creation of the mining transformers class, that class still has no standard. That is very similar to what happened also in the 2009 beverage vending machine rulemaking. The repeal rule is also arbitrary and capricious because it fails to explain or even acknowledge it's about face and practice under subsection Q. And of course, an agency can depart from agency precedent but it must do so with explanation and provide an adequate explanation for why it's taking a different course. The repeal rule does neither of those things. It doesn't provide adequate explanation or even acknowledge that it's departing from at least 15 years of agency practice under three different administrations. It doesn't adequately address Congress' express intent to give the department authority to balance performance and consumer utility against energy efficiency. It doesn't adequately explain why it now believes that no new performance feature, no matter how useful to consumers, can ever justify a different standard. It doesn't meaningfully engage with any of the canons of construction. What the repeal rule offers instead as justification for all of those APA violations is poorly reasoned statutory interpretation that cites only one handpicked dictionary definition that doesn't actually support the department's reasoning. And that just isn't good enough under the APA. The repeal rule is also arbitrary and capricious because it fails to adequately consider reliance interests. The repeal rule concludes that there are no reliance interests because short cycle machines were not yet available on the market and because there was a short time between those rules' promulgation and their proposed repeal. First, a short time period doesn't automatically preclude the formation of any reliance interests. And second, the department failed to consider two distinct categories of reliance interests. First, whether manufacturers had invested resources in research and development or actually started production of the short cycle machines. And two, if consumers were waiting for those machines to come on the market to replace their current appliance or even purchase one in the first place. The repeal rule is arbitrary and capricious also because it gives inadequate reasons for refusing to create standards for performance. I'm going to stop you right there and go back to reliance interests. Point to the evidence in the record that supports your position that there were reliance interests here. That's exactly the problem here. Had the agency done its due diligence in considering all the possible reliance interests that might exist, it would be in the rule and we would know. So your position is they just didn't do it and so we don't know, but you don't have the burden to show that, well, even though it was a very short period, very short period, that these rules were in place, that we have to, I mean, you've got no declaration, you've got no other evidence saying, yes, we would have bought or we were manufacturing these or any sort of reliance interest. Not on the manufacturing front, except that we know that consumers are the ones that their extreme dissatisfaction with the products currently on the market are what spurred the petition for rulemaking in the first place. The 2018 petition. Correct. So the reliance interests are sort of inferred or just to be developed later. And we know that manufacturers can develop, can produce these products because they did for years and years. And we also know from the market, markets are predictable, supply follows demand, consumers are asking for these products, and it's very likely, and even indicated that they might be willing to pay more for these machines. So it's very reasonable to expect that the manufacturing industry would follow that. Finally, the repeal rule is arbitrary and capricious because it gives an adequate reasons for refusing to create standards for performance classes. Under Regents, refusing, excuse me, rescinding the performance rules without considering the possibility of creating standards for the short cycle classes is arbitrary and capricious. Even assuming the department must set standards when it creates new classes, the answer is to simply create standards, not repeal the classes. If there are no more questions, I'll quickly close and then reserve the rest of my time. Let's talk about standing. Yes, sir. Tell me how the states have standing to assert any of these merits or arguments. I mean, there's the declarations, but I guess Louisiana's declarations don't really mention residential or the short cycle dishwashers and things themselves. They say they use them, but I mean, I'm thinking of one declaration maybe from the prison context that they say they use industrial sites, which wouldn't be the same products. Talk about standing. Sure. So let me start by saying that the states have two concrete interests in this regard. One, the market participant interest that your honor was just discussing, and also the loss of proprietary interest in lost sales tax revenue. And on the market participant front, Louisiana submitted the DOC declaration that you referenced and also a declaration from the Eastern Louisiana Mental Health System. Now, the department's position is that the state's last standing because all of our declarations show only an interest in industrial size machines. But the Eastern Louisiana Mental Health System declaration talks about the state purchases dishwashers, washers, and dryers for two, and I quote, residential group homes. Now, under state law, those residential group homes are a level two adult residential group homes that are limited to a maximum of 16 residents. And they function just like a household with regular household appliances. And I can point the court that the limitation to 16 residents is under the Louisiana Administrative Code, Title 48, Section I-6803. So the idea that the state's only interest here is in industrial grade machines, which are categorically not what we're talking about here, just isn't true. Also, as to the Department of Corrections declaration, that declaration shows that the state purchases these machines for DOC headquarters and throughout the state prison, which includes break rooms and offices. So we're not just talking about industrial capacity appliances for prison laundry rooms and cafeterias. Can I ask a question about Arizona? Yes. So the Arizona declarations are obviously, well, I shouldn't say obviously, at points they appear more specific than Louisiana ones. And they address specific things, including the need of, quote, unquote, consumer appliances, including dishwashers, clothes dryers, and clothes washers, with spreadsheet details for each kind. They also have, they also say that they, quote, would be inclined to purchase short cycle appliances, you know, all other things being equal, in ways that perhaps Louisiana doesn't. Now, as I understand the rule, and I'm curious if the states disagree with this, I understand Arizona has withdrawn from the case, but if standing is determined at the time that the complaint is filed, in this case, the petition is filed, I would think that we still look at the Arizona declarations, or are you telling us that the Arizona declarations are now irrelevant? I'm saying that even assuming the Arizona declarations have now been withdrawn along with Arizona, that the Louisiana declarations are sufficient. Do you have a position on what to do with the Arizona ones? I'm, well, assuming that standing is determined at the same time at the filing of a petition, just like it would be a complaint, then yes, the court can consider them. Were they withdrawn? No. Arizona left the case. They did not make a specific request to withdraw their declarations. Well, and they made the declarations at the time the petition came to us, correct? So, again, even if they did withdraw, I don't think that would do anything, if Judge Oldham's right, that standing should be judged when the petition was filed. Correct. I agree with that. Moving on to the proprietary and economic interest and lost state tax revenue. Under Wyoming v. Oklahoma, there is a direct injury in the form of a loss of specific tax revenues that's sufficient for standing purposes. Which specific revenues? From the lost sales of these short-cycle appliances. I mean, is that quantified in the record? In an exact numerical value, no, but— Any numerical value? It is far from speculation. Again, we know the manufacturers can produce these machines. They were doing it for years and years before. We know the— Don't know price. No. We know the— Don't know market preferences or whether—what if they're cheaper? Louisiana could actually lose revenue if everybody goes for the cheaper product and there's less sales tax revenue. So, it's not just an increase in price. It's also if one consumer in one of our states would have purchased a short-cycle machine to replace their existing machine before—more—sooner than they otherwise would have. But none of these were produced? Not yet. No. Not yet. The repeal rule came out and yanked the performance rules before they ever hit the market, correct. And there was no standard set? There was no standard set. That is correct. We also know, I mean, to the extent that the court is asking about traceability, I would say that under the census case, the predictable effect of government actions on decisions of independent— Not so much about traceability, but how attenuated can we be in gauging an injury based on this ephemeral effect on Louisiana's tax revenue? Under the census case, 2% of people responding to census was enough. That the idea that they just needed 2% that might choose to not answer because of the citizenship question was enough. And that was—it could be argued very speculative. We surely have that here. All we're talking about is one sale of these short-cycle machines that would have happened in any one of our states. And that seems, because of the extreme consumer dissatisfaction with the current machines, that seems beyond speculation. If there are no further questions, I'll go ahead and wrap up and reserve the rest of my time. Thank you. Are there any other grounds on which you assert that the states have standing? Are there what? Any other grounds. In other words, we've talked about the purchaser status. We've talked about the sales tax revenue or tax revenue impact. Any other ground on which you say you have standing? No. I just want to be clear. Our briefs talk about a procedural injury. That, of course, is the cause of action we're talking about here under the APA. And the—excuse me, the repeal rules, failure to comply with the APA injures the states in those two particular ways we just discussed. In closing, the repeal rule is an attempt at rulemaking on the cheap by claiming that the performance rules violated the department's statutory authority. No agency should be allowed to duck the requirements of the APA by misinterpreting the statute and contradicting years of agency practice without even recognizing that that is what the agency is doing. Petitioner states, ask the court to set aside the repeal rule as arbitrary and capricious and not otherwise in accordance with law. Thank you. Thank you, counsel. We reserve time for rebuttal. Ms. Mundell. Good afternoon, your honors. Amanda Mundell on behalf of the Department of Energy.  counsel. We don't think that the declarations in the record are good enough. As we explained in our brief, none establish even the state's desire to purchase these sorts of products. Arizona's does. I'm curious about your position on the Arizona declarations. So the Arizona would specifically say that they'd like to buy the short cycle—the new short cycle products when they become available. So what do you do with that? Well, your honor, first of all, as we know, Arizona's out of the case. But that declaration, unusually, was filed with the reply brief. It was never submitted with the petition. It wasn't even submitted with the opening brief. It was a late filed declaration, which itself is somewhat unusual. And now that Arizona has made clear that they've withdrawn their petition, it would be, I think, quite odd for the court to look at that assertion from Arizona. Quite odd, but is it impermissible that it was submitted with the reply brief? I mean, what's your authority to say it was untimely? Well, your honor, I'm not aware of a circumstance where after a first bite at the reply, a petitioner then—one petitioner submits one declaration. We didn't oppose. If I recall, they didn't ask our position before filing the motion, but we didn't file a motion opposing consideration. But now that Arizona's out of the case, things are different. So can we pause to take the two answers separately? As to the first one, as to why it's weird. So if they file an opening brief and you say, oh, you have an alleged X, or you haven't shown X, or you haven't averred X, or you haven't submitted evidence as X, if this were in the district court, if this was an APA claim in the district court as opposed to a petition for review, this happens all the time, as I'm sure you're well aware. So I'm not sure I understand why it would be weird to come back and answer—if the department says you need something that says you would buy the short cycle of things, they gave it to you. Certainly, your honor. And I think that's exactly why they submitted that affidavit. But now that Arizona's out of the case— So let's talk about that. So do you disagree with the proposition? I've researched this, and I'm curious if the department has some evidence. I can't find a case that suggests that it would be inappropriate to look at the Arizona declarations if standing is determined at the time of the filing. Right? The question is, as to the—I forgot the count—10, 12, whatever the number of states are. The question is, when they filed, is there evidence? And obviously, Arizona filed with everybody else. So after that, all I can figure out is that we would look for mootness or some other sort of case-terminating disability doctrine. But you wouldn't question whether and to what extent the one plaintiff demonstrating standing has somehow fallen out, and therefore everybody else loses it with them. You see what I'm saying? I think I understand the court's question, your honor. And I don't have a case that says you can't consider it at all. But if standing is determined at the time the petition is filed—and at the time the petition was filed, Arizona had not submitted any declaration attesting to a desire to purchase these products. And then only later, on reply, submitted that. It seems to me that that standing was not established at the time the petition was filed. And now that Arizona's gone— Well, by that logic, obviously, nobody had established it, right? Because the court's practice here, like in the D.C. Circuit, is that the petition is filed, and then you can file along with it later if you think that there's going to be standing obligations, you can file materials in support of your standing. So that obviously proves way too much. The question is, when everything is properly filed in the petition, which would include the reply brief, assuming that that's possible. And, Your Honor, I apologize. I'm just not aware of this sort of unique circumstance where, you know, the one time a declaration might actually satisfy a standing requirement, the declarant drops out of the case. I just, I don't have a case on that. It's our position that the court doesn't need to consider that affidavit. You know, had Arizona thought that it had standing to begin with, it could have submitted that declaration with all the other ones from Louisiana. And it did actually submit a declaration from a representative from the state of Arizona. That declaration just also did not happen to avert that they intended to purchase these So setting that question aside, I mean, I think there's still a question whether the sales tax revenue basis is too speculative to establish standing. But even if that is, the we want to purchase these products is not too speculative. That's right, Your Honor. Two separate grounds. That's correct. So if the court thinks that Arizona's declaration establishes standing for purposes of these other petitioners, then we would agree they're standing here to move forward. If the court is skeptical of that, then of course it would turn to petitioners' alternative standing arguments. We think that those don't hold water. There's simply no evidence in the record that the state's sales tax revenues are going to be measurably affected in a way that would be injurious based on the 2020 rule being repealed. And this other sort of procedural injury sort of stands and falls on one, whether they have these sales tax revenue effects, and then two, whether they can assert any quasi-sovereign interest, which they really haven't here. Do you think that they're, whether it's the sales tax interest, say that five times a year, or their sovereignty interests, do you think that those are somehow less concrete or less traceable than the Commonwealth of Massachusetts' were in Massachusetts v. EPA? Here, Your Honor, yes. Number one, I don't think there's any quasi-sovereign interest actually at issue here. The only thing they've said is that some consumers in our states might have wanted to purchase these products and then can't, and then eventually will maybe lose some sales tax revenue, although that's totally unquantifiable. So that, I think, takes it out of both the quasi-sovereign aspect of Mass v. EPA and then also the speculative nature of that is different. And how would you articulate both the concreteness and the traceability of the Commonwealth of Massachusetts' interest in Massachusetts v. EPA? You know, Your Honor, I'd have to go back to that case and look at it very closely. But my recollection is that, you know, unlike here, where there's simply no record evidence of whether, you know, consumers are actually going to buy these products, how much they are, whether they're going to defer buying it and waiting to see if the prices change and things like that, all of that market analysis is totally absent. And, unfortunately, Your Honor, I don't have more details on Mass v. EPA myself. If the Court is really interested, we're happy to submit a supplemental filing on that. Maybe we should just talk about the merits. Fair enough. If I could, I'd like to start with the about-face argument that petitioners have brought up in their brief and then also today at argument, this idea that the revocation of this previous rule is unlawful because the agency used to put out rules that allowed for new product classes to be standardless all the time. And the petitioners have identified both these distribution transformer rule from 2007 and the beverage vending machine rule from 2009. And I want to just start with the beverage vending rule. They're basically exactly the same. But I want to make clear that there's a big difference between what happened in those rulemakings and what happened here. In the beverage vending machine rulemaking, for example, in 2009, those various product classes never had any energy conservation standards to begin with. The 2009 rulemaking was the first time the agency had ever identified any energy conservation standards for these product classes. What happened was the agency put out a notice of proposed comment, notice of proposed rulemaking, said we plan to create product classes, Class A and Class B, and after some comments realized we ought to have a third product class, and in its rule in 2009, issued an energy conservation standard for Class A and Class B and waited to issue a standard for the conservation, I'm sorry, the combination beverage vending machines until it could have enough technological evidence or economic evidence to do so. That's perfectly compliant with subsection O and subsection Q. This rulemaking in 2020 was different because unlike the beverage vending machine rule, the products at issue in 2020 were already subject to energy conservation standards. You have to remember the dishwasher classification system was simply based on capacity. You've got your compact dishwashers and you've got your standard dishwashers. What the 2020 rule did was split off, subdivide, those product classes into two new classes, some of which retained those standards and others which dropped down to zero. Wait, so the products didn't exist but they existed and became subject to different standards? Your Honor, those products did exist. Well, they didn't exist in the form, the performance capability or the utility features of the under one hour express setting or normal setting, whatever it was. Your argument seems to be somewhat at tension with itself because in places you say, the government says, these products didn't exist, so therefore they don't have standing, they can't show anybody purchased them, there was no reliance interest, all that. Oh, but the products did exist because they were subject to these standards before they were split out as a new class. I thought what the performance rules did was create a new class of products that would have, granted, taken features that existed from existing products but made it standalone. How's that not a new class and permitted by the EPCA? Sure, Your Honor, so I want to take those in two different pieces. So first, this idea that what happened was they just created this entirely new product class, which is true, there was a new class and the agency hasn't contended otherwise. But those dishwashers in that class, those are the same dishwashers that were subject to initial energy conservation standards. All they did was when they created this class, they just re-designated the normal cycle to be a short cycle. So in other words, the 60 minutes or less cycle is now considered to be normal in this new product class. But those dishwashers with short 60-minute cycles, those exist. They're just not cycles that are considered normal. So they're not the kinds of cycles that are subject to the test procedures and then the energy conservation standards that existed at the time. That's different than what the agency did before and it's also different from the argument on reliance interest because here's why. Once the agency created this product class that was populated with some of these dishwashers that already existed but are now subject to no standards, no manufacturer piped up and said, well, we're going to now create products that have a normal short cycle. In fact, there aren't any manufacturers in the record who actually supported or challenged rather the 2020 to repeal the rules. Was there not a manufacturer in America that made a dishwasher smaller than a standard size dishwasher before the Department of Energy recognized the class of a compact dishwasher? Your Honor, I don't know the answer to that question. It's possible that there was, I just simply don't know. It seems hard to understand but let me understand something because I'm having the same issue. Maybe it's not exactly the same that Judge Wilson's referencing but it's a similar sort of tension in the argument that I don't get. If I'm understanding what you're saying, the 2020 rule, the original proposal was, quote, unquote, an amendment to applicable efficiency standards even though there was no energy efficiency standard promulgated with the 2020 rule. That's your whole basis of challenging it. So how is it an amendment to the applicable things if in the 2020 rule the Department of Energy says over and over and over again, we're coming up with the standards, we're coming up with the standards, they're really complicated, we're working on it, we're working on it, we're going to have them. So it seems wrong both coming and going. It's wrong in the sense that they say it's on their way, they're working on it, but it's also wrong in the sense I don't understand how you can call it an amendment to an applicable energy standard if your other contention is they didn't give us an energy standard. It could have ended up being the same or higher. You have no idea. That's the whole point of saying that they didn't come up with one. Sure, Your Honor, and I think that actually highlights how truly unusual this rulemaking was compared to any other rulemaking the Department has put out. This idea that the rule certainly purported not to set a new standard for these products or to amend them, but in actuality it did because these products in this new class used to be subject to standards and now they're not. And that's clear from the actual regulation itself, not just the preamble. That's the amendment problem. And the reason why the agency then in 2022 concluded that it needed to rescind that prior rule is because it realized it hadn't done that appropriate consideration under O. In 2022, when you amend the rule, the repeal rule, what we're calling the repeal rule for this litigation, is that an amendment to an applicable energy standard? This is, I think, a question that petitioners raise in their reply brief, this idea that, well, if the original 2020 rule created zero standards, then by revoking them are we amending them? That's, I think, a difficult swirl of a consideration to think through, but it might be. The thing is the agency then in this rule did do the O consideration to say, listen, we've got to go back to square one because we never considered it as an initial step, whether there were criteria of O. Is your position that in the 2022 rule, I understand you think they did do the O considerations, but is your view that the agency, the department, sorry, needed to do the O considerations in the 2022 repealer? No, Your Honor, because I think at the first instance, the very first reason why the agency revoked that previous rule was because that previous rule hadn't done the considerations it needed to. If we would then have to require the agency to do the considerations anyway to then repeal a rule that it had never done considerations for in the first place, I'm not sure that that's an appropriate basis to approach the 2022 rule. I'm not sure. I mean, the Supreme Court has told us about the process that you have to go through in Regents to repeal a rule, and it seems pretty clear that it's, if the view of the department is that what they're doing is that they promulgated a rule at time X and then at time Y they want to repeal it, Regents says, just go through the same procedures. And so that's why if your view of what they did at time X is like, well, they needed to, you know, can go through these considerations and all the stuff at O, then I'm not sure why you wouldn't have to do it at time Y. Well, Your Honor, I think the first, I mean, the first reason why is because you can't really walk through the considerations of O once you realize that you never had the stuff you needed to walk through those to begin with in the 2020 rule. So it's hard to say, for example, under O, whether, you know, the 2020 rule allowed for a maximum increase in efficiency, because the 2020 rule never actually thought about that. So I don't think that's a Regents problem. It's just a recognition that the agency now understands that it, you know, failed to fulfill its statutory obligation under subsection O, and it's gotta go back and do that. So if I'm understanding what you're saying, it's not that they failed to do what they were supposed to do in O. It is that O and the anti-backsliding provision prohibited them from recognizing this new class of products. I don't think, I don't think that's correct, Your Honor. The agency really hasn't pre-judged whether it could create a short-cycle product class, period. The agency creates product classes with, you know, different designations all the time. The problem here is that when it did create that new product class, it failed to recognize that it was now changing the standards that was otherwise applicable to that group of products to new standards. Now I'm totally confused. We took 15 minutes talking about how the agency couldn't create the short-cycle class, and the 2022 rule is full of assertions that, no, this violates the anti-backsliding provision, and you violated the applicable energy standards, and this is an unlawful amendment. It goes over and over and over, and then you spent the first half of your argument telling me they couldn't do that. The previous administration couldn't do that. And now you're saying that you haven't pre-judged it? Not at all, Your Honor, and I apologize for not being clear, so let me try to make sure we understand each other. So I just want to say at the outset, we don't think the agency can't ever create product classes. It's just that when it does create a product class that amends a standard, it's got to walk through O. And the agency was clear in the final rule that it wasn't saying that this, you know, a zero standard violates the substantive provisions of O in the same way that those provisions may interact with Q. The agency is saying, under O, the 2020 rule failed to do the appropriate considerations. That doesn't preview what the agency would do when it goes back to consider what standard ought to apply to this product class if it were to create this product class again. That's just a recognition that when it does create a product class by subdividing a class that had standards to begin with, it's got to go through the criteria for amending a standard. Do you have your record excerpts in front of you? Sure, Your Honor. I'm just going to walk through record excerpts 3, 7, 9, and 12. So I'm just going through the repealer, and I The repeal rules says, over and over again, O2A, quote, required the repeal. That's in record excerpts 3. The 2020 rules violated the anti-backsliding provision. That's citing O1. That's in record excerpts 7. The repeal rule says Q1 requires new appliance classes to be accompanied by new conservation standards complete with the heading of interpretation of 42 U.S.C. 6295Q1. That's record excerpts 9. I mean, I can keep going. I don't want to consume all your time, but like, I'm just having a really hard time understanding what you're saying this afternoon with what the agency, obviously we have to do what the agency said, but I'm trying to figure out if you're walking back from this, or if No, Your Honor, and I think we might actually be saying the same thing. I'm not trying to suggest that the agency looked at this 2020 rule and said, well, this, you know, violates anti-backsliding because it now produces a standard that was lower than what existed at the time. The agency doesn't state that. What the agency says repeatedly is that it violated those provisions because DOE didn't adequately consider them throughout the rulemaking. So I think we might be saying the same thing, and I hope I didn't confuse the court by suggesting that the agency was walking back from a position, but again, you know, if you take a look at record excerpts 7, for example, it says DOE erred when it did not adequately consider EPCA's anti-backsliding provisions in the 2020 final rules. That's in reference to a comment raised by some of the joint commenters. So that's what's going on here. So maybe what I'm getting confused by is the remedy as much as anything, because we see this all the time in APA challenges in this court, where the agency will there's some petitioner comes in and says, oh, you know, didn't consider X. And then he just goes, oh, that's actually a fair point. We'll do a new rulemaking. We'll do a new decision document. We'll do a new guidance document, whatever it is. And we're going to consider X. And they, you know, go through and they consider it. But that doesn't mean that they repeal the old rule and do 180 degrees the opposite and take the position that the statute forecloses whatever it was they had done. You see what I'm saying? And so maybe that's where the hangup is. What the agency did wasn't to say we're going to reopen the rulemaking and take in new evidence of anti-backsliding, take in new evidence of energy standards, take in new evidence of whether washing cycles actually clean anything. They just said, no, we're taking the position the statute affirmatively forecloses what we did in 2020. That's right, Your Honor. And I think that's unusual precisely because of how unusual 2020 was. There's simply no rulemaking where the agency has created a product class by subdividing an existing one, amending the standards for some of those products down to zero, and then said, but we'll defer the setting of a standard until later. That just doesn't happen. But the only way they amended the standards down to zero is if we adopt your position that they had to enact the standards or promulgate them simultaneously. But the agency itself has not done that very thing in several instances in the past, right? And so I'm glad you bring that up, Judge Wilson. Well, that's why I brought it up. That gets me back to, I think, one of the original answers to your question I was trying to give you originally, which is that, no, the agency has not done something like this before. And I understand that there are rulemakings where the agency has created product classes and deferred standards for those classes, but that's at the very first level of creating any of these product classes with standards. We're not at that first level. We've already got, on the books from Congress, standards for dishwashers and then subsequent amendments that the agency has done over time. So we're not working from, you know, square one. We're working from standards that existed already. Wouldn't the congressional standards exist already as to the new class as well? I mean, it's still in the statute, right? Your Honor, no, because in the regulation, the regulation doesn't include standards for these products anymore. That's how we know these products that have been exempted out from their original standards are now just off on their own, standardless. That's how we know there's an amendment. And that's why it's different from what the agency has done. The agency's not saying any time it does a rulemaking, it has to have a simultaneous, you know, energy standard. There are times, you know, like with the transformers or the beverage vending machines when you're starting from the very beginning where you might create a product class because you've already gone through O to determine, we just don't know what level is technologically feasible or economically justified here, and then do that analysis later. But we are well beyond that here, and that's the problem with the 2020 rule. The agency should have done that analysis before it created a rule that effectively rendered some of these products standardless. And that's all the court has to decide. Whatever other, you know, considerations that petitioners have tried to raise about conflicts in the statute or things the agency should have relied on, that's all for the next time that the agency creates these product classes, sets a standard, and then determines whether that standard either conflicts with other provisions in the Act or is appropriately justified based on the considerations in O. Just saying, there are no standards for these particular products, that's correct, Your Honor. What kind of a company would take a risk making these kind of machines if they were standardless? Well, Your Honor, I think this gets into actually some very complicated technicalities about how these procedures and how the energy standards work, so not every product as a whole is subject to a full energy standard. Here, the standards at issue for dishwashers, for example, are the normal cycle. So dishwashers include a lot of these other cycle options and aren't subject to any energy conservation standards, like pre-2020, there were dishwashers with a short cycle that could use unlimited amounts of water and energy. It was just that whatever cycle was designated the normal cycle has to go through the testing procedures and satisfy the limit. So if Your Honor is asking about this kind of squelching innovation idea, why would manufacturers ever do anything if they're not either going to meet the standard or eliminating product innovation? That's just not the case. There's a lot of ways for these products to innovate outside of just this narrow energy standard applied to, say, the normal cycle. And to figure that out, Your Honor, the court just needs to look around a basic kitchen. You know, refrigerators have come a long way. We've got clear doors and Bluetooth-enabled technology to tell us when our refrigerators are getting empty. There's so much room for innovation left in the EPCA, so long as the agency does the considerations it has to do. I don't know if you want us to look around the kitchen and help you in this case, because if there's anything that every American probably agrees with, it is that their dishwasher doesn't wash their dishes and their washing machine doesn't wash their clothes. Well, Your Honor, to the extent that that's a consideration the agency is going to look at in the future, I have full faith that it will do so under the appropriate criteria under O and Q and under P when it actually does it rulemaking. One other question about 04, because I'm not sure I understand your view about how 04 fits in this. I read the repealer rule in 2022. You say, oh, well, you know, they failed to consider the overarching purpose of the EPCA and, you know, the overarching purpose of this statute is this anti-vaccinating provision, which is clearly important. Everyone recognizes that it is. But I'm looking at 04 and it specifically requires admittedly in the context of an amendment to an applicable energy standard, but it's part of the same O considerations as everything else, that the secretary consider performance characteristics and features. And so what I'm, right, that is that if the, yes, you want to have anti-vaccinating as to energy consumption holding constant that we're not going to have negative performance characteristics and taking away features like, for example, the ability to clean your dishes or clean your clothes. So I don't quite understand how this fits into your theory and why it wouldn't be arbitrary and capricious for the secretary to just amend, I'm sorry, to just repeal the old rule without considering what was motivating in the first place, namely the need for performance characteristics and features. Your Honor, I actually don't know that subsection 04 ties into this consideration for a new feature in the same way that Q perhaps creates it. My understanding, and I'm, you know, would maybe need to flush this out with the agency, is that sometimes a product can rely on proprietary technology that effectively renders a lot of the rest of the market unable to compete. And so when you're looking at that sort of product feature, that's something the agency has to consider if it's going to be amending a standard that would basically render a lot of these other considerations no longer in play. But again, I don't think 04 comes into play with respect to this 2022 repeal rule because, of course, the agency just has to have a basis for saying that original rule was unlawful. And I don't know that the original rule really walks through 04 in great detail either. And so to the extent that there's a lack of consideration there, that sort of falls on the 2020 rule. Sorry, I didn't mean that this is features in the same sense as the Q new class of features. The way I understand 04, and tell me if the department reads this differently, it is that, I'm sorry, 04, is that when you're going through these new standard setting procedures, you're supposed to look at all sorts of different things, including economic justifications and energy consumption and whether and to what extent the new thing, like, for example, preventing dishwashers from using X amount of water or X amount of amperage or whatever, is going to make unavailable certain performance characteristics. Like, that's why, for example, I'm sitting here looking, this is RE58, you've got these tables where you have the, what is this, the median cycle of the cleaning index. I don't understand all the science that goes into the cleaning index, but clearly the department is measuring whether and to what extent products and various features of those products are in fact cleaning the things they say to be cleaning. I would think that's relevant to all of this, right, both the repeal and the original rule? Your Honor, that may well be relevant to the original rule as well. The agency doesn't really have a lot of considerations there in the 2020 rule. I mean, again, you know, the 2022 rule that revoked those earlier rules doesn't really get into a lot of 04 because that's just not simply the initial basis for why it needed to revoke them. But we agree, I mean, all of 0 is not to consider those considerations in the 2020 rule. That's another basis to think that this 2022 rule is lawful because it properly revoked the original ones. Yeah, well, I'm not sure how far it gets you if that's not what the 2022 rule says, right? Because I take it that you would agree that we judge the lawful, obviously we're just here on the petition for the 2022 rule, so we judge what the 2022 rule said in its Federal Register text, right? That's correct, Your Honor. And, you know, to the extent that the court thinks that the agency needed to offer more explanation, that's not a reason to vacate the rule, it's a reason to just remand to the agency for more explanation. All right, unless there are other questions, we just ask that you deny the petition. Thank you for your time. A few points on rebuttal. There was discussion about the standing and also about the merits. The discussion on the merits just concluded, so I'll start there. In 2013, the Department just said that it has never done this before. That is untrue. It absolutely did just this thing in 2013 with the subsequent rulemaking in the mining transformer category. And the fact that the Department is unaware of what it's done before highlights the precise problem we have here. The Department also was discussing about, you know, whether short cycle was a performance-related feature or it appeared to suggest that in the argument that was just made. The Department hasn't ever contended that short cycle is a performance-related feature under subsection O for which a separate class could be created. And to a question that was asked from the bench, the repeal rule did say that O-1 was violated. That was one of  the Department's statutory interpretation and the revocation of the performance classes. Moving on to standing, there were some questions about the supplementary declaration that was filed by Arizona. That was filed in response to the government's narrowing of the dishwasher market from just dishwashers in general to these particular short class machines. Also, there was a question about if the state might have any sovereign interest under Massachusetts EPA or other cases and I would answer that Louisiana wishes it could pass regs allowing better machines, dishwashers and washing machines and dryers but it can't. And there's a procedural injury can therefore be challenged to preserve the state's place in the federal system. And under Alfred v. Sapp, that sovereign interest of the state or quasi-sovereign interest of the state receives special solicitude. I would also say that the court is empowered to conduct discovery through appointment of a special master if it has questions about the state's standing and that of course states are never normal litigants in federal court. They have a special dual sovereign role in the governing of this nation and for these reasons the states ask the court to vacate and set aside the repeal role. Thank you. Thank you counsel. The case is submitted. I'll call the next case. 22-60247 Gold Coast.